[Civ. No. 2445. Third Appellate District.—July 21, 1922.]

LEOPOLD J. WYSEUR, Administrator, etc., Respondent, v. JAMES C. DAVIS, Director-General of Railroads, etc., Appellant.

[1] Railroads — Gates at Crossing — Operation During Certain Hours—Duty to Public.—Where a railroad company in the absence of any law or ordinance voluntarily maintains gates at a crossing which it operates during a part only of each day, it owes a duty to the traveling public to give reasonable notice of the hours during which the gates will not be operated, and the open gates during the remainder of the day give the same assur-

ance of safety to persons without knowledge of the limited operation thereof as if there were no such limitation, in the absence of reasonable notice by appropriate signs or otherwise.

[2] NEGLIGENCE — DEATH AT RAILROAD CROSSING — SPEED OF TRAIN— IMPLIED FINDING OF JURY—APPEAL.—Where in an action for the death of a person who was killed at a railroad crossing by a train operated by the defendant the jury was instructed at the defendant's request that it was for them to determine from all the circumstances whether the rate at which the train was being operated was negligence, and the uncontradicted evidence showed that the train was running at the speed of forty-five miles an hour at the time of the accident, it must be presumed in support of the verdict for the plaintiff that the jury decided the issue of negligent speed against the defendant, and this implied finding is conclusive on appeal.

[3] ID.—GATES AT CROSSING — HOURS OF OPERATION — KNOWLEDGE OF DECEASED—INFERENCE.—Where a person killed at a railroad crossing by a train was not a resident of the place where the accident occurred, it is a reasonable inference that he did not know at what hours the crossing gates were operated.

[4] ID.—DEATH AT RAILROAD CROSSING—CONTRIBUTORY NEGLIGENCE— EVIDENCE.—Where in an action for the death of a person who was killed at a railroad crossing by one of defendant's trains while riding in an automobile driven by another there was an entire absence of evidence as to what, if anything, the deceased did for his own protection, it cannot be said as a matter of law that he was guilty of contributory negligence.

[5] ID. — EXCESSIVE DAMAGES. — Where the deceased was forty-seven years of age, unmarried, in receipt of a salary of $250 a month and contributed $100 a month toward the support of his father and mother, his only heirs, who were of the age of seventy years, with a life expectancy of about nine years, a verdict of $30,000 is excessive as a matter of law.

[6] ID.—AMOUNT OF DAMAGES—INSTRUCTION.—An instruction that if the jury found for the plaintiff to award damages in such amount as in its judgment will fairly compensate for such injuries as it might find had been sustained fairly states the law, and if the defendant desired the more specific instruction of limitation to pecuniary damages, the same should have been requested.

---

2. Speed of train as negligence in absence of prohibitory statute, notes, 7 Ann. Cas. 988; Ann. Cas. 1914B, 602.

4. Gates at railroad crossing as excusing traveler from duty to look and listen, notes, 7 Ann. Cas. 801; Ann. Cas. 1914C, 704.

5. What is excessive verdict for death by wrongful act, notes, 18 Ann. Cas. 1209; Ann. Cas. 1915C, 449; L. R. A. 1916C, 820.

APPEAL from a judgment of the Superior Court of Solano County. W. T. O'Donnell, Judge. Affirmed conditionally.

The facts are stated in the opinion of the court.

Joseph M. Raines and Henley C. Booth for Appellant.

Joseph P. Lacey and W. U. Goodman for Respondent.

FINCH, P. J.—The defendant appeals from a judgment in favor of plaintiff for damages in the sum of $30,000 for the death of Roy J. Wyseur, who was killed at a railroad crossing in Dixon by a train operated by the United States Railroad Administration.

The main line from Sacramento to San Francisco runs through Dixon in a general southwesterly direction. First Street is the main highway leading out of Dixon to the north. At the intersection of First Street and the railroad right of way the defendant had maintained gates operated from a tower on the west side of the street for several years prior to the accident. It had been the custom to operate the gates from 7:30 in the morning to 7:30 in the evening and to leave them open at other times. At 7:26 in the morning the deceased was riding as a guest in an automobile being driven north on First Street by James F. Salaberry at a speed of about fifteen miles an hour. At the crossing the automobile was struck by the engine of a west-bound train running at forty-five miles an hour and both men were killed. The engineer had shut off steam and the train was quietly drifting toward the station. The usual whistles had been sounded, and immediately before the collision, but too late to avoid it, on seeing the danger thereof, the engineer gave the usual warning whistles. The tower-man, who was going to his post at the time, endeavored to warn the occupants of the automobile, but it does not appear that he succeeded in attracting their attention. The driver of the automobile apparently was not conscious of the approaching train until too late to avoid the collision, at no time reducing his speed, but turning slightly to the left at the moment thereof. When at a distance of eighty feet or more from the point of the accident,

and thereafter until it occurred, the occupants of the automobile had a clear view of the approaching train and could have seen it had they looked. For the purposes of this case it may be assumed that the driver of the automobile was negligent, notwithstanding the open gates. (*Koch* v. *Southern California Ry. Co.,* 148 Cal. 677 [84 Pac. 176]; *Griffin* v. *San Pedro, L. A. & S. L. R. Co.,* 170 Cal. 772 [L. R. A. 1916A, 842, 151 Pac. 282].)

[1] It is contended by appellant that it was not negligence to leave the gates open and unattended at the time of the accident. There was no law or ordinance requiring the maintenance of gates at the crossing, but defendant maintained them voluntarily. If the law required gates to be operated during twelve hours of the day only, failure to operate them during the other twelve hours would not constitute negligence, because travelers would be presumed to know the law, and open gates at a time when they were not required to be operated would furnish no assurance of a safe crossing. Where, however, the railroad company, though not required to do so, installs gates which it operates during a part only of each day, it owes a duty to the traveling public to give reasonable notice of the hours during which the gates will not be operated. In discussing a similar question, the absence of a flagman from a crossing, in the case of *Elias* v. *Lehigh Valley R. Co.,* 226 N. Y. 154 [123 N. E. 73], it is said: "The danger is obvious. It is like in kind to that caused by raised and untended gates. To some extent it is an assurance that the way is safe. That the railroads recognize the danger is seen by the familiar sign at country crossings giving notice that the flagman is absent after 6 P. M." (See, also, *Washington* v. *Birmingham Southern R. Co.,* 203 Ala. 295 [82 South. 545].) Where operated during certain hours of the day only, open gates during the remainder of the day give the same assurance of safety to persons without knowledge of the limited operation thereof as if there were no such limitation, in the absence of reasonable notice by appropriate signs or otherwise. "Whether required by statute or not, the fact that the gate is open is held to be an invitation to cross and an assurance that the track can be crossed in safety." (Elliott on Railroads, 2d ed., sec. 1157; *State* v. *Boston etc. R. R. Co.,* 80

Me. 430 [15 Atl. 36]; *Pittsburg, C., C. & St. L. Ry. Co. v. Tatman,* 72 Ind. App. 519 [122 N. E. 357]; *Washington* v. *Birmingham Southern R. Co., supra; Montgomery* v. *Missouri Pac. Ry. Co.,* 181 Mo. 477 [79 S. W. 930]; *Schwarz* v. *Delaware, L. & W. R. Co.,* 211 Pa. 625 [61 Atl. 255].) "Open, they proclaim safety to the passing public; closed, they proclaim danger." (*Baltimore & P. R. Co.* v. *Landrigan,* 191 U. S. 461 [48 L. Ed. 262, 24 Sup. Ct. Rep. 137, see, also, Rose's U. S. Notes].) "By these signals thousands of travelers are governed every day." (*Hooper* v. *Boston & M. R. Co.,* 81 Me. 260 [17 Atl. 64].) An open gate "is in the nature of an invitation to cross, and a declaration that there are no approaching trains." (*Pennsylvania R. Co.* v. *Stegemeier,* 118 Ind. 305 [10 Am. St. Rep. 136, 20 N. E. 843]. See, also, *Delaware & H. Co.* v. *Larnard,* 161 Fed. 520 [88 C. C. A 462]; *Louisville & N. R. Co.* v. *Eckman,* 137 Ky. 331 [125 S. W. 729]; *Carlin* v. *Michigan Cent. R. Co.,* 189 Ill. App. 23; *Lake Erie & W. R. Co.* v. *Howarth,* 73 Ind. App. 454 [127 N. E. 804].)

[2] The uncontradicted evidence shows that the train was running at the speed of forty-five miles an hour at the time of the accident. At defendant's request the court instructed the jury "that it is for the jury to determine from all of the circumstances, whether the rate at which said train was being operated was negligent." It must be presumed in support of the verdict that the jury decided the issue of negligent speed against the defendant. This implied finding of the jury is conclusive on appeal.

[3] The evidence shows that the driver of the automobile was familiar with the crossing and probably knew during what hours the gates were operated. Wyseur, the deceased, was not a resident of Dixon and, as stated by counsel for appellant, a reasonable inference is that he was without such knowledge. [4] It is urged that, as a matter of law, Wyseur was guilty of contributory negligence. "The question as to whether or not the plaintiff, while passenger or guest in an automobile, exercised ordinary care upon approaching the tracks of a railway company is a question for the jury, under proper instructions by the court." (*Nichols* v. *Pacific Electric Ry. Co.,* 178 Cal. 630 [174 Pac. 319].) "A passenger in a vehicle operated by another is bound to exercise ordinary care for his own

safety." (*Thompson* v. *Los Angeles etc. R. Co.*, 165 Cal. 748 [134 Pac. 709].) "Whether or not he exercised such care is a question of fact. Unless the evidence is all one way, this question must be submitted to the jury." (*Parmenter* v. *McDougall*, 172 Cal. 306 [156 Pac. 460].) "While the *quantum* of care which will be reasonable may be less where the gates are provided and are relied upon by the traveler, still the gates themselves are not an assurance and a warranty such as to justify a traveler in going blindly ahead in total disregard of all ordinary precautions." (*Koch* v. *Southern California Ry. Co.*, 148 Cal. 677 [113 Am. St. Rep. 332, 7 Ann. Cas. 795, 4 L. R. A. (N. S.) 52, 84 Pac. 176].) "To sustain the defense of contributory negligence the defendant must prove personal failure of plaintiff to exercise ordinary care." (*Breese* v. *Los Angeles Traction Co.*, 149 Cal. 134 [5 L. R. A. (N. S.) 1059, 85 Pac. 153].) "In the absence of evidence to the contrary, the law presumes that he did everything that a reasonably prudent man would have done under the same circumstances for the protection of his own safety." (*Carpenter* v. *Atchison, T. & S. F. Ry. Co.*, 51 Cal. App. 60 [195 Pac. 1073]; *Crabbe* v. *Mammoth Channel G. Min. Co.*, 168 Cal. 500 [143 Pac. 714]; *Baltimore & P. R. Co.* v. *Landrigan, supra; Texas & P. R. Co.* v. *Gentry*, 163 U. S. 353 [41 L. Ed. 186, 16 Sup. Ct. Rep. 1104, see, also, Rose's U. S. Notes].) In this case there is an entire absence of evidence as to what, if anything, Wyseur did for his own protection. He may have seen the approaching train and asked the driver to stop. Since the automobile was moving at such rate of speed that it could have been stopped within a few feet, he may have reasonably assumed, until too late, that the driver would stop before reaching the track. While no fixed rule has been or could be announced for the conduct of a passenger or guest under such circumstances, some of the decisions are enlightening upon the subject. In *State* v. *Boston etc. R. R. Co., supra,* it is said: "The plaintiff's case is fortified by another consideration. He neither drove nor, as far as appears, had any control of the team on which he was riding. It is reasonable to suppose that the owner carried him either for hire or gratuitously as a neighborly kindness. His position was not of the same degree of responsibility to the railroad

as was that of the driver. He was a comparatively passive party. Not that he had no duty to perform. He could have asked the driver to stop the team, or he could have left it. But it would be natural, even though his fears were excited, that he should defer to some extent to the experience and discretion of the driver who was in control of his own team; and before he had time to assert his own judgment against the driver's, or perhaps fully appreciate the situation, the inevitable event was upon him. We think this fact has considerable force in the combination of circumstances which weigh against the charge of contributory negligence." In *Ilardi* v. *Central Cal. T. Co.*, 36 Cal. App. 488 [172 Pac. 763], it is said: "In most instances such interference by the passenger or guest where the vehicle is about to be placed in a position of danger might prove to be gross imprudence and so disconcert the driver as to cause the disastrous result which such interference was designed to avoid." In *Carpenter* v. *Atchison, T. & S. F. Ry. Co., supra,* the court said: "Assuming that deceased, when the automobile which he occupied as a passenger or guest, reached the point thirty feet distant from the crossing, and traveling at a speed of only four miles per hour, saw the train 300 feet away therefrom and approaching at a high rate of speed, we cannot say as a matter of law that his failure to interfere with the driver's operation of the car rather than to rely upon the latter's judgment in escaping the threatened danger, nor his failure to leave the car, constituted contributory negligence. The question as presented was one of fact which should have been left to the verdict of the jury." It cannot be said as a matter of law that Wyseur was guilty of contributory negligence.

[5] The father and mother of the deceased were his only heirs. They were of the age of seventy years at the time of the accident. The expectancy of life of each of them was about nine years. The deceased was forty-seven years of age, unmarried, and a mining engineer, being in receipt of a salary of $250 a month. The parents lived in the home of another son. The deceased contributed $100 a month toward their support. He visited them on an average of six times a year. Under such circumstances the verdict for $30,000 is excessive as a matter of law. "The

jury is always bound by the fundamental rule that *pe-cuniary* damage is the limit of recovery, and the amount allowed must bear some reasonable relation to the pecuniary loss shown by the evidence.'' (*Dickinson* v. *Southern Pac. Co.*, 172 Cal. 727 [158 Pac. 183].) The legislature has left ''the subject of determining the amount at large, with the single restriction that the damages allowed should be just under all the circumstances of the case.'' (*Redfield* v. *Oakland C. S. Ry. Co.*, 110 Cal. 277 [42 Pac. 822].) While no exact measure of damages is prescribed for the guidance of the jury, a comparison of the sum awarded with the amount which would constitute full compensation under an exact admeasurement of damages shows that the jury could not have arrived at the amount of the verdict by any rational method of computation. The evidence shows that the parents would probably have received $1,200 a year from their son but for his death. At four per cent per annum they would receive an income of $1,200 a year on the amount of the verdict during the remainder of their lives, leaving the principal sum intact at the end thereof. Computing interest at the same rate, the present value of an annuity of $1,200 during their expectancy of life is $8,922. The pecuniary value of the son's comfort, society and protection could not amount to the additional sum of $21,078. The language of the court in *Dickinson* v. *Southern Pac. Co., supra,* is applicable to the facts of this case. It was there said: ''Eliminating, as we must, any consideration of grief and mental suffering occasioned to the survivors by the death, it is impossible to conceive how the loss of the comfort, society, and protection of the deceased could have had a money value of anything like the amount awarded by the jury.''

[6] The court instructed the jury that if they found for the plaintiff, ''then you will award damages in such amount . . . as in your judgment will fairly compensate for such injuries as you may find have been sustained.'' Appellant urges ''that the jury was not specifically instructed . . . that recovery, if any, should be limited to the pecuniary damages sustained by the mother and father.'' The defendant did not request any such instruction. The instruction given fairly states the law, and if defendant desired the more specific instruction the same

should have been requested. The instruction given is unlike the one held to be erroneous in *Pepper* v. *Southern Pac. Co.,* 105 Cal. 389, 401 [38 Pac. 974, 977], cited by appellant. In that case the court instructed the jury "that the measure of damages is not alone the pecuniary loss and injury sustained by the plaintiff in the loss of his son, as just explained, but in assessing the damages you may, in addition, take into consideration the loss, if any, sustained by plaintiff in being deprived of the comfort, society, and protection of the deceased by reason of his death." In the instant case the court did not tell the jury that anything could be allowed *in addition* to pecuniary loss. "The rule that allowance may be made for pecuniary loss from deprivation of society, comfort, and protection of a son is apparently settled and cannot now be disturbed." (*Bond* v. *United Railroads,* 159 Cal. 270, 285 [Ann. Cas. 1912C, 50, 48 L. R. A. (N. S.) 687, 113 Pac. 366].) Such allowance is not to be made in addition to pecuniary loss but as a part thereof.

In order that there may be an end to the litigation and that the parents of the deceased may be enabled, during the remainder of their lives, to derive some benefit from the sum to be awarded them, it is ordered and adjudged that if the respondent shall, within thirty days after the going down of the *remittitur* herein, file in the court below a written release of the judgment to the extent of $20,000, then the judgment shall stand affirmed for the sum of $10,000. If such release be not so filed within said time, the judgment shall stand reversed. The appellant to recover costs of appeal.

Hart, J., and Burnett, J., concurred.