[S. F. No. 10271. In Bank.—February 15, 1924.]

## C. J. GREGG, Appellant, v. THE WESTERN PACIFIC RAILROAD COMPANY (a Corporation), et al., Respondents.

[1] NONSUIT—EVIDENCE—INFERENCES—CONSTRUCTION.—On a motion for a nonsuit, every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence adduced must be considered as facts proved in favor of the plaintiff. Where evidence is fairly susceptible of two constructions, or if one of several inferences may reasonably be made, the court must take the view most favorable to the plaintiff; if contradictory evidence has been given it must be discarded.

[2] ID.—EVIDENCE — CONSTRUCTION. — On a motion for nonsuit the plaintiff must be given the benefit of every piece of evidence which tends to sustain his averments and such evidence must be weighed in a light most favorable to plaintiff's claim.

[3] ID. — EVIDENCE — CONSTRUCTION. — Evidence whether erroneously admitted or not, if relevant to the issues joined, must be given the credit and benefit of its full probative strength, and any question arising from the fact of variation between the evidence of the witnesses cannot be raised or considered.

[4] ID.—PRIMA FACIE CASE—DENIAL OF MOTION.—The evidence must be taken most strongly against the defendant, and if the plaintiff has introduced proof sufficient to make out a *prima facie* case under the allegations of his complaint, the motion, if made upon the close of the case, should be denied.

[5] NEGLIGENCE — COLLISION BETWEEN AUTOMOBILE AND TRAIN AT CROSSING—PERSONAL INJURIES—NONSUIT—EVIDENCE.—In an action for damages for personal injuries sustained by plaintiff when an automobile which he was driving was struck by a train at a crossing, if the evidence in the record and also the circumstances of the case are such that the question whether or not plaintiff was negligent in approaching the crossing is one upon which reasonable men might well disagree, then the motion for a nonsuit should not have been granted.

[6] ID.—CONDUCT OF PLAINTIFF IN ATTEMPTING TO PASS CROSSING— EVIDENCE—APPEAL.—In such action, the supreme court is not prepared to say as a matter of law under the circumstances of the situation that plaintiff in determining his action had no

6. Care required of driver of automobile at railroad crossing, notes, Ann. Cas. 1913B, 680; Ann. Cas. 1915B, 767; 21 L. R. A. (N. S.) 794; 29 L. R. A. (N. S.) 924; 46 L. R. A. (N. S.) 704.

right to take into consideration or to be influenced in any degree by the movement of the traffic or by the investigation made by the conductor of an electric car approaching the crossing from an opposite direction as to its being reasonably safe to cross said track a second or two after the car had passed over it upon the invitation that was being extended by the absence of a warning.

[7] ID.—RAILROAD CROSSING—CHARACTER OF.—A railroad crossing is itself a place of danger and is an effectual warning of danger which must always be heeded, and the exercise of ordinary care in traveling over such place is not excused by the negligent omission of the railroad company itself to exercise reasonable care.

[8] ID.—ADOPTION OF SAFETY MEASURES—QUANTUM OF CARE.—A railway company will not be permitted to encourage the public to relax its vigil as to the dangers that lurk in railroad crossings by assurances that the danger has been removed or minimized by the adoption of safety devices and measures and at the same time hold a person to the same *quantum* of care as if no such safety measures had been adopted.

[9] ID.—ABSENCE OF FLAGMAN FROM CROSSING—OPEN GATES—ASSURANCE OF SAFETY.—The danger arising from the absence of a flagman from a railroad crossing is like in kind to that caused by raised and untended gates. Where operated during certain hours of the day only, open gates during the remainder of the day give the same assurance of safety to persons without knowledge of the limited operation thereof as if there were no such limitation, in the absence of reasonable notice by appropriate signs or otherwise. Whether required by statute or not, the fact that the gate is open is held to be an invitation to cross and an assurance that the track can be crossed in safety.

[10] ID.—QUESTION OF FACT.—The extent to which a traveler may rely upon the assurance of safety arising from the absence of a flagman from his post of duty on the presumption that it is safe for him to cross a railroad track which he is familiar with is generally held to be a question of fact for the jury.

[11] ID.—NONSUIT—ERROR.—In such an action, the case should have been submitted to the jury under appropriate instructions by the trial court.

APPEAL from a judgment of the Superior Court of Alameda County.   A. F. St. Sure, Judge.   Reversed.

The facts are stated in the opinion of the court.

9. Conduct of flagman or absence from his post as affecting liability for injury at crossing, notes, 16 A. L. R. 1285; 41 L. R. A. (N. S.) 355.

Ostrander & Carey for Appellant.

Stephen J. Otis, Snook & Brown and Thos. J. Ledwich for Respondents.

Morrison, Dunne & Brobeck, *Amici Curiae.*

SEAWELL, J.—Appeal from a judgment of nonsuit in an action by appellant to recover damages from respondents for injuries sustained by the former while driving an automobile by reason of being struck by an engine drawing a train of cars, which, it is alleged, was operated by respondents in a careless and negligent manner.

A single track of the Western Pacific Railroad Company, a steam railroad, occupies a position on East 12th Street, a few feet south of the center line of said street, in the city of Oakland. Its course through Oakland is in an easterly direction. Twenty-third Avenue, which extends northerly and southerly, intersects said East 12th Street at a right angle. The San Francisco-Oakland Terminal Railways Company, with its termini in Oakland and Alameda County, operates a double-track electric system over and along said avenue. The place where the accident occurred is within quite a busy suburban business section of said city of Oakland. At the time of the injury the Western Pacific train was moving in a westerly direction and the automobile was traveling southerly.

The east property line of Twenty-third Avenue northerly from East 12th Street is entirely occupied with business buildings, which shut off the easterly view of respondent company's railroad track, except as the line of vision is broadened by moving southerly upon the northerly property line of East 12th Street. Business houses occupy the northeast corner formed by said intersecting streets and continue easterly along the property line of East 12th Street for some distance. A station-house for the accommodation of a flagman or watchman, whose duty it was to give warning signals to persons and to the traffic moving along East 12th Street at the point where it is intersected by Twenty-third Avenue of approaching trains moving either easterly or westerly across said East 12th Street, occupied a position about six feet south of the building line along East 12th Street and eight feet east of the property line of Twenty-third Avenue if projected southerly, leaving a passageway

six feet in width between said buildings and station-house. Said station-house, as thus placed, served to further obstruct a full view of the railroad track looking easterly from Twenty-third Avenue. This station-house was six by eight feet in dimensions and eight feet in height. The steam railroad track runs on a straight line for some distance before reaching the crossing and continues until Twenty-fourth Avenue is reached, at which point it turns to the south. The distance from the north property line of East 12th Street in a direct line to the north rail of respondent's track is approximately forty-four feet. It was stipulated by the parties hereto that "from a point ten feet north of the northerly rail of respondent's track on the west street-car track looking east the Western Pacific track can be seen for a distance of nine hundred feet; from a point thirty-three feet north a thousand feet; between ten feet north and thirty-two feet north, at the following distances, between nine hundred feet and a thousand feet; from a point forty feet north the track can be observed for a distance of two hundred feet; from a point fifty feet north it would be observed for a distance of one hundred and sixteen feet." It was also stipulated that the flagman's house was thirty-two feet from the nearest rail of said track and was the nearest fixed obstruction. The overhang of the engine was from two and one-half to three feet from the nearest rail. East 12th Street is thirty-eight feet in width from curb to curb and Twenty-third Avenue is fifty-two feet.

For a period of about six months prior to the collision East 12th Street had been in a state of repair. The travel was along the northerly side. Trenches eighteen inches in depth and one foot in width had been dug along the outside of the north rail and ties were piled near by. These trenches led up to within eighteen inches of the rails of the electric tracks, and vehicles in crossing East 12th Street were compelled to keep within the limits of the street-car tracks, thus requiring care and attention on the part of drivers in directing automobiles through a narrow passageway. Very near the moment that the automobile was struck an electric car operated by the San Francisco-Oakland Terminal Railways Company, and moving northerly, had crossed the rails of the Western Pacific track. This car was forty feet in length and was crowded with passengers so densely as to entirely obstruct the view of objects on the opposite side of said car.

The train of respondent was evidently running at high speed; no whistle was blown or bell rung or alarm given in any manner to warn persons or the traffic of the approach of the train. The flagman or watchman who was accustomed to warn the public of approaching trains from a position near the center of the intersection of said streets was absent from his post. The main physical facts sufficient for an understanding of the situation have been substantially stated. Other facts and circumstances important to a consideration of the case will be developed as the discussion progresses.

It is important to keep in mind from the outset the well-established rules of law which must control this court in determining whether or not the motion of nonsuit was properly granted. In so doing we must view with reasonable favor the evidence offered in support of appellant's case. [1] "Every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence adduced must be considered as facts proved in favor of the plaintiff. Where evidence is fairly susceptible of two constructions, or if one of several inferences may reasonably be made, the court must take the view most favorable to the plaintiff. If contradictory evidence has been given it must be discarded. (*Estate of Arnold,* 147 Cal. 583 [82 Pac. 253].) [2] The plaintiff must be given the benefit of every piece of evidence which tends to sustain his averments and such evidence must be weighed in a light most favorable to plaintiff's claim. (*Anderson* v. *Wickliffe,* 178 Cal. 120 [172 Pac. 381].) [3] Evidence whether erroneously admitted or not, if relevant to the issues joined, must be given the credit and benefit of its full probative strength, and any question arising from the fact of variation between the evidence of the witnesses cannot be raised or considered. [4] The evidence must be taken most strongly against the defendant, and if the plaintiff has introduced proof sufficient to make out a *prima facie* case under the allegations of his complaint, the motion, if made upon the close of the case, should be denied. (*Bush* v. *Wood,* 8 Cal. App. 647 [97 Pac. 709]; *In re Daly,* 15 Cal. App. 329 [114 Pac. 787]; *Wasserman* v. *Sloss,* 117 Cal. 425 [59 Am. St. Rep. 209, 38 L. R. A. 176, 49 Pac. 566]; *Hoff* v. *Los Angeles Pacific Co.,* 158 Cal. 596 [112 Pac. 53]; *Lassen* v. *Southern Pac. Co.,* 173 Cal.

71 [159 Pac. 143]; *Kleist* v. *Priem,* 51 Cal. App. 32 [196 Pac. 72].)'' (*Berger* v. *Lane,* 190 Cal. 443 [213 Pac. 45].)

In the light of the foregoing rules the evidence must be examined. Learned counsel for respondent have rather assumed a contrary position. To illustrate: Appellant, upon insistent questioning, hazarded an estimate as to the width of an open space which was rapidly closing as the electric car and the automobile approached each other from opposite directions, and through which opening appellant momentarily looked easterly in observation of respondent's track, and through which opening he claimed to have had an unobstructed view of said track for a distance of about 150 feet. It is urged that the lines of vision limited by an open space of but five and one-half inches in width, as estimated by appellant, rendered it impossible for him to have observed the track for so great a distance as 150 feet. For the purposes of this motion the extent of the view must be accepted and the space through which it was made must be widened to accommodate itself to the most favorable advantage of appellant, and, if necessary to that end, it must be entirely discarded.

This case falls within the rule controlling guarded crossings, and the evidence must be considered in its relation to those rules and not confined solely to the rules which govern unguarded crossings such as were applied in *Herbert* v. *Southern Pac. Co.*, 121 Cal. 227 [53 Pac. 651], *Green* v. *Southern Cal. Ry. Co.*, 138 Cal. 1 [70 Pac. 926], and in many subsequent cases dealing with facts analogous to the facts of those cases. That is to say, each case must be considered and decided in reference to the facts peculiar to it.

Observing the rules of construction which apply to motions of nonsuit, the facts in the instant case may be thus stated. Appellant, who was employed as a steam-fitter by the San Francisco Shipbuilding Corporation, was, on the morning of November 27, 1920, on his way to said shipyards pursuant to his employment, which yards are situate near the foot of said Twenty-third Avenue, in the city of Alameda. His course to and from his work was along said Twenty-third Avenue, which crosses East 12th Street, the place of the accident. Twice a day, morning and afternoon, appellant had driven his Overland automobile, of the touring-

car type, over this course for a period of more than six months. He was, therefore, quite familiar with the location. On the day in question he left his home at the usual hour and arrived at the crossing, where the injury occurred, at about the hour of 7:43 A. M. Earlier on that morning he had overtaken a fellow-workman who was on his way to the shipyards, and who, upon appellant's invitation to ride, took a seat at his right. As he approached the East 12th Street crossing he reduced the speed of the automobile from a rate of twelve or fourteen miles an hour to a rate of five or six miles an hour. As he continued to move southerly and crossed over the north property line of and into East 12th Street an electric car moving northerly was proceeding to cross the track of the Western Pacific Railroad Company. The electric car arrived at the street crossing prior to appellant's arrival, but it was stopped within about ten feet of the track of the Western Pacific, and the conductor, in obedience to the established rule and custom in such cases, went forward to make an observation as to approaching trains. Seeing none he gave the motorman the signal to cross the track. The entrance into and the exit from the car was located midway from either end of said car. In making the crossing the electric car traveled at the rate of about two miles an hour. At a point about six feet from the northerly rail of the Western Pacific's track the conductor boarded his car. The rear end of the forty-foot car had not then cleared the steam railroad track. At a point approximately twenty-five feet north from the north rail of said steam railroad track said conductor again looked in an easterly direction and saw the light thrown forward by the reflector of the engine drawing the passenger train as it was about to make the curve and enter into East 12th Street. The distance from Twenty-fourth Avenue to Twenty-third Avenue is 350 feet. He estimated the engine, by the light he saw, to have been 200 feet beyond this distance, making a total distance of 550 feet. Neither the conductor, who had walked across the track to make observation for approaching trains, or the motorman, while his car was motionless, or appellant, who was traveling very slowly, or the two or three other persons who were on the sidewalk on Twenty-third Avenue near the scene of the accident, and in favorable positions to have heard an alarm, if given, heard a whistle

blown or bell rung or any kind of warning given of the
oncoming train. It must be assumed for the purposes of
this motion that no warning whatsoever was given. Had a
whistle been sounded or a bell rung the alarm would, ac-
cording to the testimony, have been heard. Appellant, upon
nearing the track, had checked his speed to five or six miles
an hour, and testified that he listened and also looked, so
far as the conditions appeared to him to require it, for
trains that might be approaching. His view to the west
was full and complete. To the east it was limited by the
station-house of the watchman and obstructed by the pass-
ing street-car, which was crowded with standing passengers.
The electric car, as it cleared the tracks, missed being struck
by the engine drawing said train of cars by but a few feet.
Appellant, upon the next moment after the rear of said
electric car had cleared the steam railroad track, was prac-
tically upon said track when he observed the engine so
closely upon him, a distance of four feet, as to make, so he
claims, his escape impossible. His automobile was hit back
of the left front wheel with great force by the engine. No
person except the conductor of the electric car and the occu-
pants of the automobile seem to have been aware at any time
of an approaching train until the accident occurred. The
automobile was carried forward quite a distance by the en-
gine. The train was brought to a stop at a distance vari-
ously estimated from 150 to 250 feet from the place of im-
pact. The rate of speed at which the train was traveling is
not definitely fixed, but there is testimony to show that it
was traveling at a somewhat fast rate of speed. One wit-
ness who heard the crash said: "I could see that the emer-
gency brakes were on—could see the smoke or dust. When
I say that the brakes were smoking, it might have been
smoke or dust, I don't know if it was either." From what
he then saw he was of the opinion that it had been traveling
at a rate exceeding twenty miles an hour. Appellant also
testified that it was traveling at a fast rate of speed. Some
notion of its speed may be gained by an estimate of its
position when first seen by the conductor and the time re-
quired to reach the crossing considered in relation to the
position of the electric car at the time of the collision and
also with reference to the distance required to stop the train.
It was evidently an overdue train, as no train had been

seen before to pass the point in question at the time this
train was passing, by appellant or by any of the persons who
were familiar .with the situation and whose duty it was to
inform themselves on train schedules.   At the time appellant
got a view of the steam railroad track between the watch-
man's station and the front end of the electric car, for a
distance of 150 feet, the train had evidently not then moved
into or passed through that area.   If it had passed beyond
it, judging by comparative rates of speed, it would have
crossed the intersecting track ahead of appellant and passed
safely on.   Passengers in the car obstructed appellant's
view through the car windows.

The question presented is whether appellant, under all the
facts and circumstances of the particular case, was, as a
matter of law, guilty of contributory negligence in proceed-
ing to cross said railroad track without listening or looking
more effectively or intently than is shown, or by stopping,
if circumstances required it, before crossing said railroad
track.

Conceding respondent Railroad Company to have been
negligent in its omissions, was appellant also guilty of negli-
gence under the exigencies of the situation by a failure to
exercise ordinary care and prudence in attempting to cross
said track?   [5]   If the evidence in the record and also the
circumstances of this case are such that the question of
whether or not appellant was negligent in approaching the
crossing is one upon which reasonable men might well disa-
gree, then the motion for nonsuit should not have been
granted.   (*Hoff* v. *Los Angeles Pacific Ry. Co., supra.*)

The appellant had crossed the steam railroad track at the
point in question daily for several months preceding the
injury.   During all of that time he had never seen or known
of a train passing along East 12th Street at the hour he was
struck.   He knew that a signalman was stationed at said
crossing whose duty it was to warn the traffic of approaching
trains by giving signals from a position near the center of
the intersecting tracks.   He was not aware of the absence
of the watchman or flagman from his *post of duty* and sup-
posed that his absence from the signal point was an invita-
tion, as it usually was, to cross and that it was safe to do so.
No whistle was blown or bell rung by the engineer in charge
of the train.   Coupled with these circumstances he observed

the electric car passing across the track. It is clear from his testimony that he was aware of the rule of electric and street railways requiring motormen to stop their cars and send forward the conductor to make sure that no train is approaching before crossing a steam railroad track. He had worked as a fireman on locomotives. It was testified to by one witness that it was usual for respondent's employees to give warning of trains moving along East 12th Street by blowing a whistle before arriving at the Twenty-third Avenue crossing notwithstanding the maintenance of a watchman.

[6]  We are not prepared to say as a matter of law under the circumstances of the situation that appellant in determining his action had no right to take into consideration or to be influenced in any degree by the movement of the traffic or by the investigation made by the conductor of the electric car as to its being reasonably safe to cross said track a second or two after the car had passed over it upon the invitation that was being extended by the absence of a warning.

Respondent places much reliance upon what is said in the case of *Jones* v. *Southern Pac. Co.*, 34 Cal. App. 629 [168 Pac. 586], to sustain the judgment of nonsuit. There the rule of *Chrissinger* v. *Southern Pac. Co.*, 169 Cal. 619 [149 Pac. 175], and *Griffin* v. *San Pedro, L. A. & S. L. R. Co.*, 170 Cal. 772 [L. R. A. 1916A, 842, 151 Pac. 282], to the effect that: ''Where the standard of conduct is so obvious as to be applicable to all persons and the plaintiff has failed to measure up to that standard, under the circumstances shown, he is not entitled to have his case go to the jury,'' is re-stated. It is true that that case involved as an element the question of an absent flagman. But the facts of that case are not the facts of this case  The elements which make up the case now before us and which have been stated were not present in *Jones* v. *Southern Pac. Co., supra.* There the view of the plaintiff was unobstructed and for a distance of thirty feet from the nearest rail of the track he had a plain view of defendant's train and his conduct under the simple circumstances of the case was inexcusable. If he had looked at all he would have seen the peril into which he was blindly driving. Other opportunities of protection were open to plaintiff in that case which are not shown in the present case. We do not here hold that one who blindly

attempts to cross a steam railroad track, whether the crossing be guarded or unguarded, and by reason of such negligence is injured by being hit by a passing train has a cause of action against the railroad company. The law casts upon everyone the duty of exercising such care as is commensurate with the situation. The question is as to the *quantum* of care that was required to be exercised by appellant in the instant case.

[7] It is true, as has often been stated, that a railroad crossing is itself a place of danger and is an effectual warning of danger which must always be heeded and the exercise of ordinary care in traveling over such place is not excused by the negligent omission of the railroad company itself to exercise reasonable care. [8] But it is also true that a railway company will not be permitted to encourage the public to relax its vigil as to the dangers that lurk in railroad crossings by assurances that the danger has been removed or minimized by the adoption of safety devices and measures and at the same time hold a person to the same *quantum* of care as if no such safety measures had been provided. In *Koch* v. *Southern Cal. Ry. Co.*, 148 Cal. 680 [113 Am. St. Rep. 332, 7 Ann. Cas. 795, 4 L. R. A. (N. S.) 521, 84 Pac. 176], it is said that the adoption of safety gates or any other appliances by a railroad company for the protection of the public does not absolve the public from all duty of taking care of itself. "A person is still required to exercise due and ordinary care, and while the *quantum of care* which will be reasonable may be *less* where the gates are provided and relied upon by the traveler, still the gates themselves are not an assurance and a warranty *such as to justify a traveler in going blindly ahead in total disregard of all ordinary precautions,* as did the plaintiff in this instance." (Italics ours.) Continuing, it quotes the following from *Ellis* v. *Boston etc. R. R. Co.*, 169 Mass. 600 [48 N. E. 839] : "The raising of the gates was, no doubt, a circumstance which justified the plaintiff in starting to cross the railroad when he did, and he had a right to expect that if any engine or train was approaching the crossing on the inbound track, a whistle would be sounded or a bell be rung. But in attempting to cross the railroad he was bound in the exercise of ordinary care, to himself exercise his own powers of observation, and to take thought for his own safety; and

he was not entitled to have his case go to the jury unless
there was evidence from which it could be inferred that he
did this. . . . While the raising of the gates justified the
plaintiff in attempting to cross when he did, and while that
fact and the facts that no whistle was sounded and no bell
was rung are to be taken into consideration on the question
of how much he must himself look and observe as he makes
his way across, these circumstances do not excuse him from
looking and listening and taking thought for his own safety.
He cannot rely wholly upon them, and cannot recover with-
out showing more as to his own conduct than that he so
relied.''

The general situation as presented by the instant case is
different from the situation stated in the case of *Koch* v.
*Southern Pac. Co., supra.* To the limited elements named
in that case may be added the further facts that appellant
was traveling at a very slow rate of speed and was listening
and looking as herein described, and that he entered upon
the track immediately after an electric car crowded with pas-
sengers had crossed it after investigation made by the con-
ductor as to approaching trains. Other elements which must
be considered are that the train appeared from around a
curve and could not have been seen at any point near the
crossing until it had approached within nine hundred or a
thousand feet of said crossing; said train was not running
on schedule time, but was a belated or an extra train; that
the passageway over which appellant was compelled to
travel had been narrowed by repairs that were being made
to respondent's track which required extra care to be given
by the driver to the way over which he was passing. If a
reasonably prudent person situated as appellant was situ-
ated, and seeing what he then saw and knew, would have
been justified in acting upon appearances as appellant
assumed to do, or, if reasonably prudent men would disagree
as to whether appellant exercised ordinary care in the prem-
ises, then the case should have gone to the jury. The invita-
tion to cross, the failure to ring the bell or sound the whistle,
as required by the provisions of section 486 of the Civil
Code, are elements which must be considered with all the
other facts and circumstances of the entire case. The case
of *Koch* v. *Southern Pac. Co., supra,* is not inconsistent with
anything said in *Wyseur* v. *Davis, as General-Director of*

*Railroads*, 58 Cal. App. 598 [209 Pac. 213]. **[9]** The rule is there correctly stated to be: "In discussing a similar question, the absence of a flagman from a crossing, in the case of *Elias* v. *Lehigh Valley R. Co.*, 226 N. Y. 154 [123 N. E. 73], it is said: 'The danger is obvious. It is like in kind to that caused by raised and untended gates. To some extent it is an assurance that the way is safe. That the railroads recognize the danger is seen by the familiar sign at country crossings giving notice that the flagman is absent after 6 P. M.' (See, also, *Washington* v. *Birmingham Southern R. Co.*, 203 Ala. 295 [82 South. 545].) Where operated during certain hours of the day only, open gates during the remainder of the day give the same assurance of safety to persons without knowledge of the limited operation thereof as if there were no such limitation, in the absence of reasonable notice by appropriate signs or otherwise. 'Whether required by statute or not, the fact that the gate is open is held to be an invitation to cross and an assurance that the track can be crossed in safety.' (Elliott on Railroads, 2d ed., sec. 1157; *State* v. *Boston etc. R. R. Co.*, 80 Me. 430 [15 Atl. 36]; *Pittsburg, C., C. & St. L. Ry. Co.* v. *Tatman*, 72 Ind. App. 519 [122 N. E. 357]; *Washington* v. *Birmingham Southern R. Co., supra; Montgomery* v. *Missouri Pac. Ry. Co.*, 181 Mo. 477 [79 S. W. 930]; *Schwarz* v. *Delaware, L. & W. R. Co.*, 211 Pa. 625 [61 Atl. 255].) 'Open, they proclaim safety to the passing public; closed, they proclaim danger.' (*Baltimore & P. R. Co.* v. *Landrigan*, 191 U. S. 461 [48 L. Ed. 262, 24 Sup. Ct. Rep. 137, see, also, Rose's U. S. Notes].) 'By these signals thousands of travelers are governed every day.' (*Hooper* v. *Boston & M. R. Co.*, 81 Me. 260 [17 Atl. 64].) An open gate 'is in the nature of an invitation to cross, and a declaration that there are no approaching trains.' (*Pennsylvania R. Co.* v. *Stegemeier*, 118 Ind. 305 [10 Am. St. Rep. 136, 20 N. E. 843].) See, also, *Delaware & H. Co.* v. *Larnard*, 161 Fed. 520 [88 C. C. A. 462]; *Louisville & N. R. Co.* v. *Eckman*, 137 Ky. 331 [125 S. W. 729]; *Carlin* v. *Michigan Cent. R. Co.*, 189 Ill. App. 23; *Lake Erie & W. R. Co.* v. *Howarth*, 73 Ind. App. 454 [127 N. E. 804].)"

**[10]** The extent to which a traveler may rely upon the assurance of safety arising from the absence of a flagman from his post of duty on the presumption that it is safe for

him to cross a railroad track which he is familiar with is generally held to be a question of fact for the jury. (33 Cyc. 1027; Elliott on Railroads, sec. 1651.)

"It has often been said by this court that it is very rare that a set of circumstances is presented which enables a court to say, as a matter of law, that negligence has been shown. As a general rule, it is a question of fact for the jury, an inference to be deduced from the circumstances of each particular case, and it is only where the deduction to be drawn is inevitably that of negligence that the court is authorized to withdraw the question from the jury." (*Hoff* v. *Los Angeles Pacific. Co.*, *supra*, quoting from *Sellers* v. *Market St. Ry. Co.*, 139 Cal. 268 [72 Pac. 106].)

[11] We are of the opinion that the case should have been submitted to the jury under appropriate instructions by the court.

The judgment and order of nonsuit are reversed.

Lawlor, J., Lennon, J., Waste, J., Myers, J., Richards, J., and Wilbur, C. J., concurred.